

1                   IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ALABAMA
2                        NORTHEASTERN DIVISION

3

4
UNITED STATES OF AMERICA,

5
        vs.                   CASE NO.:  5:08-cr-242-RDP

6
ROBERT MICHAEL EVANS,

7
            Defendant.

8

9

10                          * * * * * * * * * *

11                          TELEPHONE CONFERENCE

12                          * * * * * * * * * *

13
            BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

14
DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday,

15
December 11, 2019, commencing at 3:40 p.m.

16
APPEARANCES (VIA TELEPHONE):

17
FOR THE GOVERNMENT:       Mr. Russell E. Penfield

18                        Assistant United States Attorney
                          OFFICE OF THE UNITED STATES ATTORNEY
19                        400 Meridian Street N, Suite 304
                          Huntsville, Alabama  35801
20
FOR THE DEFENDANT:        Mr. Zachary Lee Newland

21                        Attorney at Law
                          BRANDON SAMPLE PLC
22                        P.O. Box 250
                          Rutland, Vermont  05702

23
                Proceedings reported stenographically;

24                  transcript produced by computer.

25                          * * * * * * * * * *

```
 1        (The following proceedings were heard before the Honorable

 2        R. David Proctor, United States District Judge, at

 3        Birmingham, on Wednesday, December 11, 2019, commencing at

 4        3:40 p.m.:)

 5             THE COURT:  We are on the record.  I do have Risa, my

 6   court reporter, with us.  Kecia is here too.

 7             So what is going on with this?

 8             MR. PENFIELD:  Well, Judge, just to -- I'll try to give

 9   the thumbnail.  Mr. Evans is serving a life sentence.  He was

10   originally sentenced by Judge Johnson after a jury trial.  It's

11   a drug and gun case --

12             THE COURT:  Right.

13             MR. PENFIELD:  -- which -- and it was affirmed on

14   appeal, but that was all back in 2008 and 2010.

15             Mr. Newland, on behalf of Mr. Evans, has filed a motion

16   for compassionate release, which they -- the defendants can now

17   do, go straight to the district court judge.

18             Previously, Judge, the petition -- the defendant would

19   make a request to the warden of the facility.  And if the warden

20   of the facility found extraordinary and compelling reasons for a

21   medical release, a compassionate release, then they would

22   notify -- generally, I think the process was they would

23   generally notify us.  And when we got that from the warden, we

24   would file something with the Court, and the Court could grant

25   that if the Court wanted to.  Under the First Step Act, the --
```

1   and this is all under Section 3582 of Title 18.  With the First

2   Step Act, the defendant can now go directly to the Court, so

3   Mr. Evans filed that.

4           Just procedurally, I think it was there for a little

5   while.  I think my office was trying to figure out who responds;

6   and it turns out it's me, which is fine.  And at that point, I

7   was advised and let the Court know that Mr. Evans -- and this is

8   what I have been told by the prison, by the doctor, and his case

9   manager and a lawyer with BOP.

10          At that point when I had that conversation, the first

11  one, he was -- he was ambulatory with a walker.  His issues are

12  he's dealing with -- in addition to some other sort of medical

13  conditions, diabetes and hypertension, that sort of thing, he's

14  got pressure sores on his backside because he is even

15  wheelchair-bound based on a car accident that he had in 2003.

16  And I'll let Mr. Newland correct me if I'm wrong on that.

17          So we just -- at that point, my response was, well,

18  let's just wait -- oh, and they were also trying to evaluate

19  Mr. Evans for a transfer to a medical facility where he could

20  serve his sentence there because he does have to -- when he gets

21  these infections in his pressure sores -- which are serious; I

22  don't doubt that they're not serious -- but they were pursuing

23  that transfer.

24          I then received -- and I have attached this to my

25  response.  He did -- his case did finally go through the

1    procedural part, the administrative part of requesting that the

2    warden recommend a compassionate release.  That went all the way

3    up to general counsel in D.C., and that was ultimately denied.

4    It's not that I don't think Mr. Evans can procedurally be here

5    now; but I think that's important for the Court to know, that

6    BOP did evaluate it and they did not recommend a compassionate

7    release.

8            Then the Court ordered a further response from me

9    because I think it had been some 30 days since there had been

10   movement.  So I filed my reply on Friday objecting.

11           I don't think this is extraordinary and compelling, but

12   the Court may well.  I don't know if Mr. Newland is suggesting

13   if the Court needs to have a hearing on -- hearing from the

14   prison doctors.  And Mr. Evans has an expert who has attached a

15   report.  I don't think he's seen Mr. Evans but reviewed his

16   medical records.

17           The last thing I can say is that -- well, two last

18   things.  One, I did talk to the hospital -- I mean the prison

19   and to a BOP attorney.  Mr. Evans' transfer has been approved,

20   but it could take some weeks for that to happen.  I sent an

21   email to ask if there was an update, and I have not yet received

22   a reply.  And then the last thing is that I -- Mr. Newland has

23   now filed a reply to my response that I got this afternoon,

24   which is -- which is fine, but I have not had a chance to read

25   that yet.

```
 1              And let me say, first of all, Mr. Newland and I have
 2   worked well together on this case.  We both have our positions,
 3   but we've been collegial and it's all been fine.
 4              All that being said, I think my position ultimately,
 5   Judge, would be either to deny it, knowing that Mr. Evans --
 6   that I've made a representation that it looks like he is going
 7   to be transferred at some point to a facility where he will have
 8   medical care instead of having to go in and out of the hospital
 9   when he gets an infection.  And I think that's where we would
10   probably end up anyway.
11              I -- as a stopgap, I would say, well, Judge, they're in
12   the process of transferring him to a medical facility.  Let's
13   get him up there and see how he does.  And then if Mr. Newland
14   and Mr. Evans want to come back with the new information about
15   how is he doing in a hospital setting, then the Court could
16   evaluate that.  But I think that's where we are.  And I hope I
17   didn't ramble too much.
18              THE COURT:  No.  I get that.
19              Mr. Newland, what's your position on all this?  Let me
20   ask you this.  If he was in an appropriate BOP medical
21   facility --
22              MR. NEWLAND:  Your Honor, I guess if I may?
23              THE COURT:  Yes.  I'm sorry.  I was speaking and you
24   couldn't hear me.  I was asking you this question.  If he's in
25   an appropriate BOP medical facility -- and I realize he's not
```

1  right now; but if he was, would there still be a basis for

2  compassionate release?

3         MR. NEWLAND:  Yes, Your Honor, I believe that there

4  would be.

5         THE COURT:  And why is that?

6         MR. NEWLAND:  I believe that -- if I could, Your Honor,

7  that he has a condition from which he's unlikely to recover

8  ever, Your Honor, which is part of the criteria.  And more

9  importantly, Your Honor, that Mr. Evans has gone through this

10 and had this condition actually for a number of years.  And it

11 goes beyond -- he does have pressure (telephone interference),

12 which are very, you know, of course, (telephone interference)

13 and debilitating, as opposing counsel recounted.  More

14 importantly, he has osteomyelitis, which is a foot infection,

15 which he has had and has flared up off and on since 2011, Your

16 Honor.

17        And if I could just recount the procedural history a

18 little bit.  Before that, you know, Mr. Evans did submit his

19 request to the warden 60 days before filing his initial motion,

20 which the Court denied without prejudice.  And this -- he's had

21 these conditions before.  He's gone to the hospital before

22 multiple times, Your Honor, and his conditions have continued to

23 worsen.  And the BOP has known about these conditions for years,

24 frankly, Your Honor, going back to 2007, as Dr. Snow's report

25 makes clear and the BOP medical records make clear.

1          But Your Honor, I don't have any reason to believe that

2    the BOP, even if he were to be transferred to the federal

3    medical center -- which I think the government has the burden,

4    one, to prove that.  I take Mr. Penfield's representations as

5    true, of course.  But at the same time, I don't believe that

6    they have the level of care, frankly, to provide the treatment

7    that he needs when a lot of the treatment that he needs, it

8    sounds like, is going to require orthopedic surgery and

9    specialized plastic surgery related to specific wound care.  And

10   at least the BOP (telephone interference) --

11          THE COURT:  Hey, Mr. Newland, you need to --

12   Mr. Newland, are you on a voice-over Internet call?

13          MR. NEWLAND:  Yes, Your Honor.

14          THE COURT:  You're really breaking up.

15          MR. NEWLAND:  I apologize, Your Honor.

16          THE COURT:  There you go.  You're better now.  You're

17   better now.

18          MR. NEWLAND:  Would you prefer for me to call back in?

19          THE COURT:  Let's give it a shot by just keeping your

20   mouth very close to the phone, though.

21          MR. NEWLAND:  Yes, Your Honor.  I apologize.

22          THE COURT:  That's okay.

23          MR. NEWLAND:  As I was saying, Your Honor, I don't

24   believe that simply transferring Mr. Evans would (telephone

25   interference) the extraordinary and compelling nature of his

1  condition.  I don't believe that anything has been put forward

2  to even (telephone interference) contradict of the report.

3  There's (telephone interference) provided detailing the severity

4  of these conditions and everything that Mr. Evans is going

5  through.

6          And further, I'd just like to point out that it -- the

7  optimum -- I think (telephone interference) since we originally

8  filed (telephone interference) --

9          THE COURT:  Okay.  You're back to breaking up terribly.

10  Let's have you call back in.  Call back in for us, please.

11          MR. NEWLAND:  Yes, Your Honor.  I apologize.

12          THE COURT:  Thank you.

13    (Brief pause)

14          MR. NEWLAND:  This is Zach Newland for Robert Evans.

15          THE COURT:  Yes.  That sounds much better.

16          MR. NEWLAND:  My apologies, Your Honor.

17          THE COURT:  That's okay.  No.  I just wanted to make

18  sure I was able to hear what you had to say and, equally

19  importantly, my court reporter is able to report what you were

20  saying.

21          MR. NEWLAND:  Sure.

22          THE COURT:  Okay.  So I'm -- this was not my case.

23  Judge Johnson sentenced him back in '09; is that right?

24          MR. PENFIELD:  Yes.  It was either '8 or '9.  Yes.

25          THE COURT:  Yes.  I'm pretty sure it was back in 2009.

1  March 25, 2009.

2          MR. PENFIELD:  Okay.

3          THE COURT:  And it was a life sentence.

4          MR. PENFIELD:  Yes, Your Honor.

5          THE COURT:  I'm getting the J&C up just to make sure

6  that -- it's under seal.  I think I can access it here.

7          MR. PENFIELD:  He was sentenced to life, Your Honor.

8  And on appeal, the Eleventh Circuit found that Judge Johnson --

9  and Mr. Evans, by the way, Judge, was in a wheelchair at the

10  time of his trial and his sentence.

11          THE COURT:  Right.  That's what I was going to ask you.

12  Right.

13          MR. PENFIELD:  They affirmed the sentence,

14  acknowledging that she had considered the 3553(a) factors and

15  found that it was substantively reasonable.  He had argued it

16  was not a reasonable sentence.

17          THE COURT:  Yes.  He also got the statutory maximum on

18  several other counts, 120 months?

19          MR. PENFIELD:  I think that was the -- I think the last

20  count was a felon in possession.  Yes, Judge.  And that was

21  concurrent with that, with the life sentence.

22          THE COURT:  He got 120 months on counts 36, 53, 89; 96

23  months on count 37, 54, 55, 76, 90; and 120 months on count one.

24  Count -- so the point -- I guess my question is -- this is the

25  first compassionate release claim I've handled under 3582, the

 1    new First Step Act.  Explain how the factors work when someone

 2    has a life sentence and the sentencing judge -- not me, but the

 3    sentencing judge -- intended for them to spend the rest of their

 4    life, in health or otherwise, in prison.

 5            MR. NEWLAND:  Sure.  Your Honor, if I may, Zach Newland

 6    for Robert Evans.

 7            THE COURT:  Yes.

 8            MR. NEWLAND:  Your Honor, in my reading of the

 9    statute and how it's been amended by Congress is that Congress

10    did not set any limitation on the types of sentences for which a

11    motion to reduce sentence based on extraordinary and compelling

12    circumstances could be granted.  So I think the way that I

13    interpret the statute and I believe that courts have looked at

14    this so far is that it's a two-step inquiry.

15            First it's has Mr. Evans shown and demonstrated

16    extraordinary and compelling reasons, as defined by the United

17    States Sentencing Commission in their policy statement, that

18    might warrant or essentially open the door for a sentence

19    modification or reduction.  And if that threshold showing is

20    made, then I believe that the Court goes back and looks at the

21    3553 factors as they apply to Mr. Evans today, at this current

22    time.  So the parsimony principle of, you know, the need for the

23    sentence -- all the 3553 factors that the Court is certainly

24    familiar with apply to him now because if Congress wanted to

25    have except out sentences that were -- that were life sentences

```
 1   or 50 years or more --

 2          THE COURT:  Yes.  I'm not saying that he's not eligible

 3   to apply.  What I'm saying is is it extraordinary and compelling

 4   reasons if he's saying that I need to get out of jail because I

 5   have a life-threatening disease, when he received a life

 6   sentence.  I mean, I'm not being callous or -- certainly not

 7   wanting to be callous.  But the idea being someone who receives

 8   a life sentence without the possibility of parole, which is what

 9   Judge Johnson administered and what the Eleventh Circuit

10   affirmed on appeal -- are those -- does that make these

11   circumstances less extraordinary and compelling compared to

12   someone who says I'm due to get out of jail in three years but

13   I've got a life-threatening condition that I won't make it that

14   long?

15          MR. NEWLAND:  So I -- I think, Your Honor, that it

16   doesn't necessarily make it any less extraordinary and

17   compelling.  I think it does go essentially to the 3553 factors.

18   But as a matter of policy, we have decided that there is, you

19   know, essentially a back-in safety valve and escape hatch

20   because the sentence is not, you know, you have to die from

21   debilitating -- you know, these terrible medical conditions and

22   bone infections, which, you know, continue to send you to the

23   hospital and you suffer from sepsis and all these sorts of

24   conditions.  It was, of course, to life imprisonment at the

25   time; but, you know, Congress certainly knew that compassionate
```

1   release could be sought.  And I don't think it diminishes the

2   extraordinary and compelling nature of his request.  But I do

3   think, you know, if anything, it would go to the 3553 factor

4   analysis.

5           And I apologize for jumping in there.  I think

6   Mr. Penfield was trying to speak.

7           THE COURT:  No.

8           MR. PENFIELD:  No, no.  I think I was clearing my

9   throat.

10          THE COURT:  Yes.  So Mr. Penfield, do you have a view

11   on the question I just asked Mr. Newland?

12          MR. PENFIELD:  I do, Your Honor.  I think -- I think

13   that Mr. Newland -- and I see Your Honor's point.  I think

14   Mr. Newland has a point in that it's probably a bifurcated --

15   probably a bifurcated analysis in which the Court could say,

16   look, I acknowledge that these are extraordinary and compelling.

17   I think that people who have, you know, terrible lung cancer and

18   all manner of diseases are -- you know, those can be

19   extraordinary and compelling conditions and diseases.

20          But Your Honor is correct in that -- and Mr. Newland

21   acknowledges that then the Court -- if the Court was to make

22   that finding, then the Court still has to look at the 3553(a)

23   factors and decide whether or not that original -- I'll just

24   keep calling it the life sentence -- is reasonable, is a

25   reasonable sentence for Mr. Evans.  I would argue (telephone

1    interference) set forth in just a few of the facts of Mr. Evans'

2    case, which I won't go into because the Court, if it needs to,

3    will have benefit of the presentence report and, you know, the

4    Eleventh Circuit's opinion.  And we could always have argument

5    as if it was a sentencing hearing.

6          I think perhaps the Court could say -- because

7    Mr. Newland has submitted a lot of medical records.  I will note

8    that a lot of the medical records go back many, many, many

9    years.  I think the primary focus right now is the condition

10   that he has with the ulcers and whether or not it's causing

11   infections.

12         But I think -- and I appreciate Your Honor saying that

13   and using the word "callous," because the government does not

14   want to be callous either.  But if I'm taking Your Honor's point

15   correctly -- or at least the government would advocate that yes,

16   these are sad circumstances.  They may even be extraordinary and

17   compelling circumstances.  But the decision was made that

18   Mr. Evans, whenever it happens and whatever causes it, was to

19   spend the rest of his life in prison.

20         THE COURT:  And let me ask you this.  There were a

21   number of motions filed pro se by Mr. Evans that have not been

22   terminated on the dockets that were seeking retroactive

23   application of the guidelines under 3582.  I don't see the

24   government responded to that.  And to be honest with you, it

25   looks like that might have gone through the cracks a little bit.

```
 1   Our probation office has not gotten me anything on that.  Have
 2   you done an assessment whether he's -- have either one of you
 3   done any assessment of whether he's eligible for retroactive
 4   application of the guidelines under 3582(c)(2)?
 5            MR. NEWLAND:  I have not, Your Honor.
 6            MR. PENFIELD:  I have not, Judge.  And I'm not -- and I
 7   certainly hope nothing fell through the cracks, but I'm
 8   not (telephone interference) with that motion.  I know he had
 9   (telephone interference) motion (telephone interference)
10   property.  But I (telephone interference) know.  And I certainly
11   (telephone interference) check in and -- and see where that
12   motion is and --
13            THE COURT:  Yes.  I'm going to get my probation
14   office --
15            MR. PENFIELD:  A lot of times, those motions -- a lot
16   of times, those motions, I think, go to -- I think when they get
17   filed, I think the -- I think the Public Defenders Office has
18   been tasked with initially reviewing them.
19            THE COURT:  That's right.
20            MR. PENFIELD:  And if they think they've got a case,
21   then I think they --
22            THE COURT:  They make an appearance.
23            MR. PENFIELD:  -- reach out to our appellate section
24   and say, look, we really think this pro se defendant is correct.
25            THE COURT:  Right.  I suspect there's nothing to them
```

 1   because I've not heard from the Federal Defenders Office or

 2   probation or, for that matter, the U.S. Attorney's Office.  But

 3   I just -- let's do this.  Let's -- I'll take a look on my end.

 4   Because this -- that would be a 3553(a) factor -- right? -- if

 5   the guidelines were such that he no longer would have gotten a

 6   life imprisonment sentence and he's seeking compassionate

 7   release; right?

 8            MR. PENFIELD:  I believe that's -- I believe that's

 9   correct.  And there's one -- and there's one twist in this case

10   that had to do with whether or not the life sentence was

11   imposed -- well -- well, and actually, I think it would go a bit

12   to the government's argument.  I don't think the life sentence

13   was necessarily imposed based upon statutory mandatory minimum

14   because the jury did not find the (b)(1)(A) amount of cocaine --

15   I believe it found the (b)(1)(B) amount of cocaine -- but

16   because he had prior drug convictions, that his statutory

17   maximum became life.

18            So even in light of the fact that the life sentence was

19   not mandatory and the judge did not impose it as a mandatory

20   sentence -- if I'm recalling this correctly -- Mr. Newland, I

21   don't know if you have looked into that or thought about it --

22   but I think that makes it more compelling that her decision was,

23   I'm not giving you this life sentence because I have no choice;

24   I'm giving you this life sentence because this is what I think

25   the correct sentence is.

```
 1              THE COURT:  Right.
 2              MR. NEWLAND:  Your Honor, in all frankness, I would
 3    have to refresh my recollection with the sentencing transcript
 4    to be able to do that, Your Honor.  I think -- you know, I think
 5    we've conceded that it could be relevant to the 3553 analysis.
 6    But at the same time, I think it's an independent analysis that
 7    the Court is to engage in at this point.
 8              And just to the Court's point, while we've been on the
 9    phone, just by way of reference, I mean, I have already located
10    at least one case post First Step Act, October 15th, out of the
11    District of Oregon, where someone who had a lifetime term of
12    imprisonment was granted compassionate release over the
13    government's objections, just to -- generally speaking.  And I
14    can provide that citation in supplemental filings to opposing
15    counsel and to the Court, if the Court would like.
16              THE COURT:  Yes, I think that's one thing I'd like both
17    sides to take a look at and submit to me.
18              Okay.  So we had a little bit of a false start about
19    Mr. Penfield's response.  It's in.  And now I have your reply
20    just filed, actually, while we -- about an hour before we got on
21    the phone; right?
22              MR. NEWLAND:  That is correct, Your Honor.  I
23    apologize.  I was actually moving across country after traveling
24    the last four days, so I was trying to furiously get that done.
25              THE COURT:  No.  That's fine.  That's fine.  But I've
```

1   got that.

2          So Mr. Penfield, where do we stand on a decision about

3   a federal medical facility?  I mean --

4          MR. PENFIELD:  I got -- while we've been on the phone,

5   I got an email back from the BOP, which simply says -- because I

6   had sent her an email and said I have a -- I have a conference

7   call with the Judge, has there been any word.  And she wrote me

8   back and said no word yet.  So I'll follow up on if I can get

9   some more specific answers on where we are in that process.

10         So I will also say this, Judge.  I have been advised by

11  the doctor -- and I think they're going to -- I have been led to

12  believe that -- although sometimes these can take some time.

13  This may be faster because it has been concurred with by a

14  wound-care team.  The doctor at Talladega sent his request for

15  transfer; and in part of that review process, it is reviewed by

16  a wound-care team who has concurred.  That's what I've been

17  told.  I don't have any paper that says that, but that's what I

18  have been told.  So they think that might make it faster.

19         MR. NEWLAND:  And, Your Honor, if I just could -- to --

20  as we stated at the outset, Mr. Penfield and I have been

21  incredibly cordial throughout this and I think worked very well

22  together.

23         You know, part of our frustration, from Mr. Evans'

24  point of view, is the fact that, you know, all of these things

25  that the BOP says is happening, whether it's his transfer or his

```
 1  treatment or the position that the BOP is providing to the
 2  government and they're understandably taking, you know,
 3  there's -- we're never provided with anything in writing or a
 4  hearing or the ability to challenge these conclusions or what
 5  their -- you know, there are doctors who are supposedly saying
 6  that he can, you know, do his activities of daily life or daily
 7  living, but we're not given any, you know, actual records from
 8  them, whether it's findings -- there's review boards that they
 9  go through in these sorts of processes, and there's things that
10  the BOP either has done or routinely would do.  And frankly,
11  there's just no evidence other than the representation that
12  they're continuing to make to the U.S. Attorney's Office.  And,
13  you know, to that point, I think, at a minimum, a hearing would
14  be merited on -- on the claims and representations that they're
15  making.
16          MR. PENFIELD:  It's -- it's fair that those are
17  representations based upon what I know.  And I know that the
18  Court knows and I believe that Mr. Newland would accept that I
19  would -- I would not make a representation if I did not believe
20  that to be correct.
21          So -- but -- and the last thing I'll say there is that
22  I don't think we're in a position -- and Mr. Newland made the
23  point before that BOP has not done things before or they haven't
24  transferred him before.  But I don't think that this process is
25  necessarily for -- for the government or at least the U.S.
```

 1  Attorney's Office to defend the Bureau of Prisons and what

 2  they -- not that I don't think it's defensible, but I just think

 3  that's -- I don't think the Bureau of Prisons goes on trial in

 4  this process.

 5         If the Court ultimately needs a full-blown hearing with

 6  the doctor from Talladega and Mr. Newland's medical records and

 7  makes its determination, I do think -- and I'm not trying to

 8  overstep any important stage in this process for Mr. Newland or

 9  his client, but I think the Court -- if the Court reviewed what

10  it has before you and said, you know, even -- even -- I've

11  reviewed what Mr. Newland has submitted, I've reviewed what the

12  government has submitted -- which, I will admit, I -- all the --

13  all the medical records that I'm aware of I believe Mr. Newland

14  already has.  And he's submitted those in his filing, so I

15  didn't resubmit the medical records.  But if we need to have a

16  hearing about the medical thing for the Court to make that

17  finding -- but I think the Court could probably review the

18  records and say -- and the record as a whole -- and say, you

19  know, even if I found extraordinary and compelling

20  circumstances, I would still find that this life sentence is

21  reasonable and deny the motion.

22         THE COURT:  Right.  Okay.  Well --

23         MR. PENFIELD:  But I'm ready to have any hearing that

24  the Court wants.  Obviously, we're going to look into the 3582

25  and --

```
1              THE COURT:  Well, one of the things I might be
2    interested in doing that Mr. Newland has kind of suggested is
3    making sure that I hear from somebody besides you in this case.
4              MR. PENFIELD:  Okay.
5              THE COURT:  And maybe getting a report promptly from
6    the BOP about exactly what the care plan is for him, whether
7    that's going to involve him transferring to a federal medical
8    center for care, because, quite frankly, if he's getting --
9              And I don't know what the plan -- Mr. Newland, if
10   you've worked with your client to determine what health care
11   he's going to get if he is released.  I take it --
12             MR. NEWLAND:  Yes.  I apologize.
13             THE COURT:  I take it he's probably not able to work
14   and he hasn't won the lottery.
15             MR. PENFIELD:  Well, Judge -- and actually, I pointed
16   this out in my response.  Mr. -- in Mr. -- in Mr. Newland's
17   argument in support of his client, it is noted that -- one of
18   the claims that Mr. Newland wants is that if he's out, he can
19   pick his own physician.  I don't think that necessarily --
20   that's probably one of the reasons that you're in prison is you
21   don't necessarily get to pick your own physician.  But I don't
22   know -- he does reference Spain, but I don't know if they would
23   take him -- in Birmingham.  But with regard to the activities of
24   daily living, which I do think is an important thing, in
25   Mr. Newland's motion, he says, and if he's out, he can have a
```

1  job at a restaurant.  I don't know if that's the same family

2  restaurant which actually had a role in this case.  But, I mean,

3  he even says, I can get out and pick a doctor and work.  That

4  seems to me just -- I just want out.

5        THE COURT:  Yes.

6        MR. NEWLAND:  Your Honor, to your point that you had

7  asked, the reason we do reference UAB Spain Wallace

8  Rehabilitation Center in Birmingham, Alabama, is that my

9  client's family has already reached out and made contact -- I am

10  not sure 100 percent about the provision of medical insurance,

11  as far as that portion of it in particular.  But I do know that

12  it's been represented that they would be willing and able to

13  provide him treatment, if he were able to get out, to address

14  the osteomyelitis that has been ongoing and to provide some very

15  specialized care that is necessary, in addition to potentially

16  working with Dr. Rodney Snow as well to the extent that that is

17  necessary.

18        But, you know, we tried to provide the Court with a

19  reasoned plan because in sentence reduction motions in general

20  and also in other, you know, Section 404 motions, we anticipated

21  that that's going to be a question, his ability to work.  But I

22  don't know right now, you know, what his ability to work

23  long-term would be.  I ask the clients always, you know, what

24  would you do if you can work when you get out, and that was what

25  Mr. Evans said his -- you know, that he had lined up if he could

1   get there.  But that would be assuming, of course, that his

2   condition would improve to the point to where he doesn't have to

3   be in a hospital bed for months at a time.

4           MR. PENFIELD:  But we don't -- but if I understand

5   Mr. Newland -- and I know the Court probably doesn't want us

6   just going back and forth.  But if he does not have insurance,

7   then Mr. Evans comes out and then is essentially a ward of the

8   State in the same condition that he is now.

9           MR. NEWLAND:  Your Honor, I don't think that's an

10  appropriate factor to consider under 3553, frankly, to be honest

11  with you, whether -- the existence of his health insurance

12  coverage and being, quote-unquote, a ward of the State.  I don't

13  know his health insurance coverage --

14          THE COURT:  No.  But Mr. Newland, I'm not asking that

15  question.  What I'm asking is would his quality of life and

16  health care be any better if he was out than it would be in a

17  federal medical center, particularly when he was given a life

18  sentence by the judge that was affirmed by the Eleventh Circuit.

19  Okay?  In other words --

20          MR. NEWLAND:  Yes, sir.

21          THE COURT:  -- does that effect extraordinary and

22  compelling circumstances.  I think -- I think you have to look

23  at the extraordinary and compelling circumstances through the

24  lens of the sentence that was imposed and the intent of that

25  sentence.

1          And here, there's no question.  Judge Johnson, who's

2    retired from our court now, thought, after sitting through a

3    trial and a sentencing hearing of your client, that he needed to

4    spend the rest of his living days in federal prison.  So I do

5    think an appropriate factor is if the federal medical center can

6    provide him on level with the same care he would get if he's

7    out, then what's the compelling reason for him to escape a life

8    sentence imposed by Judge Johnson.  I think that's clearly a

9    factor.

10          So here's what I'm going to let y'all do.  I'm going

11   to -- I'm going to require -- I'm going to require the

12   government to give me a report.  And I'm going to put your

13   client's feet to the fire a little bit there, Mr. Penfield.

14   Tell them no more -- tell them this goes to the top of the

15   priority list, because I need to know what they're thinking

16   here.

17          MR. PENFIELD:  Okay.

18          THE COURT:  I want a report by December 20th about what

19   their plan is to deal with Mr. Evans' health condition.  That's

20   end of next week.

21          MR. PENFIELD:  Yes, sir.

22          THE COURT:  I know that's a short deadline, but they've

23   had plenty of time to be thinking about this, and they've

24   represented through you that they're working on it.

25          MR. PENFIELD:  Yes, sir.

 1          THE COURT:  All right.  And then once you get that

 2  report, Mr. Newland, you can tell us about -- I'll get everybody

 3  back on the phone.  It will probably be right after the first of

 4  the year.  And we will address where we go from there.

 5          I realize, Mr. Evans, you're in a hurry.  And I

 6  understand the reason you're in a hurry to get this done.  But

 7  when we're dealing with a life sentence, I am not going to be

 8  hair trigger on making a decision about whether your client

 9  should come out.  I'm going to give it the appropriate

10  deliberation it deserves.  Fair enough?

11          MR. NEWLAND:  Extremely fair, Your Honor.

12          THE COURT:  Okay.

13          MR. PENFIELD:  Yes, Judge.

14          THE COURT:  Okay.  So let's -- I think the next step is

15  let's get a plan in place from the BOP.  And tell them I'm

16  wanting them to commit.  Measure twice and cut once,

17  Mr. Penfield.  Does that make sense?

18          MR. PENFIELD:  Yes, sir.

19          THE COURT:  Tell them this is now a priority.  If they

20  don't want it to be a -- if it's not a priority for them, that

21  might send me a signal.

22          MR. PENFIELD:  I will pass that on.

23          THE COURT:  I would like to know what their plan is to

24  deal with Mr. Evans, because I am concerned about his current

25  care, but I'm also concerned about the fact that he's got a life

```
 1   sentence.  And Judge Johnson, when she delivered that sentence,

 2   was not born last night.  She knew that meant he was going to

 3   die in prison.  And as hard as that sounds, that's what the

 4   intent of the sentence was.  Okay?

 5           MR. PENFIELD:  Yes, sir.

 6           THE COURT:  So I've got to balance out some --

 7           MR. PENFIELD:  And I will -- I will just say, just so

 8   the Court knows -- and I think Mr. Newland would agree -- that

 9   when -- when Mr. Evans has had -- if his pressure sores worsen

10   or they go in and they discover infection, Talladega takes him

11   to the hospital and he stays in the hospital until the hospital

12   says, okay, you can take him back to prison.  So he's not just

13   lying in a prison bed, you know, getting seen by a nurse, you

14   know, or something like that.

15           THE COURT:  Right.

16           MR. PENFIELD:  So he goes to the hospital if they feel

17   like he needs to go.  So --

18           THE COURT:  All right.

19           MR. NEWLAND:  All right.  Your Honor, if I could, one

20   last thing just very quickly.  On the -- on the report, to the

21   extent that it relies on medical records, particularly new

22   medical records of Mr. Evans, we don't have any stuff from the

23   last few months because the medical records are being generated

24   in a private hospital, and we're not allowed to know even the

25   location of where he's being held to even get those medical
```

1  records.  Is there any way that we could see the records of just

2  Mr. Evans that just BOP is relying on with that report?

3          THE COURT:  Mr. Penfield, any objection to that?

4          MR. PENFIELD:  May I -- may I speak to the lawyer at

5  BOP?

6          THE COURT:  Yes.  But tell them I think that only makes

7  sense, because if we have an evidentiary hearing on this,

8  they're going to have to produce all that anyway; right?

9          MR. PENFIELD:  Correct, Judge.  And I will -- I will

10  work with them on that.

11          THE COURT:  And tell them what you're trying to do --

12          MR. PENFIELD:  I know Mr. Newland -- I know Mr. Newland

13  has done releases, but -- and there probably are security

14  concerns about which hospital.  I don't know if there are or

15  not.  I'm just speculating.  I don't know.

16          THE COURT:  Well, I don't think they have a lot of

17  choices in the Talladega area.

18          MR. PENFIELD:  I don't disagree, Your Honor.  But I --

19  but I just don't know.  And I don't know if that's -- I don't

20  know if that's a BOP rule that, no, we will not even tell you

21  where your client is in the hospital.  I don't know if that's

22  a -- I don't know if that's a policy or an administrative

23  procedure.  I don't know.

24          THE COURT:  Well, they can redact the name of the

25  hospital as long as they give the medical records of the care

```
 1   being provided, if that's their concern, and then we'll take up

 2   whether that -- let's just get the records.  If they think

 3   there's some redactions that have to take place, you counsel

 4   with them about that, make sure they're reasonable, that it's

 5   defensible from your standpoint.

 6             MR. PENFIELD:  Yes, sir.

 7             THE COURT:  And then if Mr. Newland says, no, I've got

 8   to know what hospital he's at, we'll address that.

 9             MR. PENFIELD:  Okay.

10             THE COURT:  Okay.  Thank y'all for being available.

11             MR. PENFIELD:  I'm going to make that contact now, Your

12   Honor.  Thank you, Judge.

13             THE COURT:  Take care.  Bye-bye.

14        (Proceedings concluded at 4:19 p.m.)

15                     *  *  *  *  *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25
```

1                          COURT REPORTER'S CERTIFICATE

2              I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4              This 26th day of December, 2019.

5

6

7                              Risa L. Entrekin
                               Registered Diplomate Reporter
8                              Certified Realtime Reporter
                               Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25